Glenn D. LEE, Plaintiff,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.

No. 16123–1.

United States District Court
W. D. Missouri, W. D.
May 9, 1967.

James E. Thompson, Jr., Crouch, Crouch, Spangler & Douglas, Harrisonville, Mo., for plaintiff.

F. Russell Millin, U. S. Dist. Atty., John L. Kapnistos, Asst. U. S. Atty., Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

This is an action to review a final decision of the Secretary of Health, Education and Welfare denying plaintiff's application to establish a period of disability and to obtain disability insurance benefits under the Social Security Act. Under usual procedures the decision of the hearing examiner was administratively adopted and therefore stands as the final decision of the Secretary. This case pends on the defendant's motion for summary judgment.

We shall find and determine that defendant's motion must be denied for the reasons we shall state. In summary, we shall hold that the hearing held by the Secretary was controlled by the improper application of Section 404.1510 of the Regulations. Application of that regulation in a manner quite similar to the application of that and other regulations fully discussed in three cases recently decided by this Court requires that the decision of the Secretary be reversed. See Pollard v. Gardner, D.C., 267 F.Supp. 890, decided April 14, 1967, Underwood v. Gardner, D.C., 267 F.Supp. 802, decided May 4, 1967, and Homm v. Gardner, D.C., 267 F.Supp. 926, decided May 8, 1967.

### I.

The hearing examiner stated the following facts, undisputed in the record, in regard to plaintiff and his relatively recent work record:

The claimant, Glenn D. Lee, testified that he was born on June 24, 1910. This agrees with Exhibit No. 1, his application filed in the instant case; and Exhibit No. 2, his application for an account number. He testified that he was 56 years of age at the time of the hearing. The claimant completed the third grade in school and had no other education. He can barely read and write and cannot read the daily newspaper without spelling out the words. The claimant finished his schooling, the third grade, around the year 1919.

As to claimant's work record, he testified in accordance with Exhibit No. 7, that from 1947 to March of 1964, he owned and operated an 80 acre farm on which he raised corn, cattle and hogs. Twenty of these acres were in cultivation and the rest in pasture. Claimant owned and operated a tractor, with which he tilled the twenty acres. He plowed, planted and did all the rest of the work on the twenty acres, and fed the cattle and hogs himself. The last year he was on the farm he had

some help during haying time, whom he hired to help pick up bales because his back was hurting him at the time.

\* \* \*

He has had no employment or self-employment and has done no work for wages or income of any kind since June 15, 1964.

From 1919 to 1937 plaintiff worked as a common laborer. He did carpentry work after 1937, joining that craft union in 1946. He worked on an assembly line during the second World War.

The hearing examiner's description of plaintiff's present activities is undisputed by any other evidence in the record. Indeed, it is corroborated by plaintiff's wife [Tr. 55], and by a report of contact in August of 1965 [Tr. 100]. The hearing examiner's description of those activities was as follows:

The claimant spends his time at home, sitting or lying around the house, and his wife does all the cooking and the housekeeping. Claimant complains of pain in his left hip and neck, and the pain he complained of in Exhibit No. 13, to Dr. Kirsch, begins about the middle of his back at about the level of his belt and goes down to his tail bone. He described it as being tender and burning and tingling. It also goes down through a hip and gives the same pain and burning sensation along the top and side of one leg, from his hip down to his knee. There is no differentiation in portions of the area of the leg down to the knee so affected, but the pain goes on a straight plane down the top and side, but not below the knee. Claimant testified that he also has some neck pain but not as much as he does in his back and hips and it really isn't enough to bother about. It does not radiate any place but is present in the back where his head fastens on the "neck bone," and is on the neck proper and on the right side. This pain occurs only after he has been lying in one position, but it goes away with activity, in from 30 minutes to an hour. The pain in his back and leg occurs when he stays in one position, and if he moves and gets into a different position, either lying down or getting up or sitting up, it goes away, but then if he stays in that position for an hour or so, it starts hurting again and he has to change his position. In a standing position, the pain commences within ten or fifteen minutes, but he can stand it for an hour to an hour and a half, after which he must change his position.

His activities at home include the fact that he tries to rake the yard but can stay at it only for a little while, about fifteen or twenty minutes, and then has to either lie down or sit down. This causes pain in his back. He did re-shingle the small roof on his home, covering an area of "four squares." He defined a square as an area three feet by three feet in dimension. It took him four days to do this, although he did complete the job. He did the work by sitting down on the roof. He stated that he could not stand or kneel. Claimant has a garden of about one hundred square feet. He hires the ground plowed, and he is able to hoe a little standing up. His wife does the planting and picks the vegetables when ready. He again repeated that his wife did all the housework and he just goes to bed or lies down or sits down or goes for a short walk. He testified that he could walk about two blocks but if he tries to walk further than that he has to sit down and rest for a while because of back pain. He complained that any twisting motion of the back made his head and back feel as if they were trying to slip out of place. *His appetite is good; he has lost no weight, but has maintained his present weight for about ten or fifteen years.* He complained that he was only able to sleep about two hours at a time when he has to get up, go and eat something and sit up a while and then go back to bed and start over again. He testified that he doesn't get over four or five hours a night sleep. He has taken some pills but quit them because he woke before the pain pills "run out." He didn't know whether

these were pain pills or sleeping pills. He had taken aspirin but it didn't do any good, so that currently he is under no medication. (Emphasis the hearing examiner's.) [Tr. 8–9].

Before the hearing was held, the hearing examiner forwarded various medical reports of Dr. Peltier, one of defendant's employed medical advisors. Dr. Peltier was then advised as follows:

You will be asked to testify at the hearing, as an expert medical witness, on the basis of the enclosed documents, as well as any additional documents and oral medical testimony that may be offered at the hearing. If you feel that further pre-hearing documentation is necessary (for the purpose of giving testimony as a medical advisor), please advise us immediately by mail. [Tr. 117].

Dr. Peltier was not asked to, nor did he in fact examine plaintiff. The limitations and restrictions placed upon Dr. Peltier and the hearing examiner's intended exclusion from consideration of all medical evidence based on anything other than objective data was forecast by the hearing examiner's explanation of what he expected to develop by Dr. Peltier's testimony. In his letter to Dr. Peltier, the hearing examiner stated:

You may expect to testify by pointing out the pertinent clinical or laboratory findings which, in your opinion, do establish pathology and the degree of such pathology, i. e., mild, moderate or severe. You may also be asked to compare such findings with normal findings and to testify as to your opinion with respect to the validity of diagnoses or prognoses already in the record. [Tr. 117].

The hearing examiner's examination of Dr. Peltier followed the forecast of his letter. In regard to two reports of Dr. Kirsch, which, if accepted, would establish plaintiff's disability, the following examiner of Dr. Peltier was conducted:

HEARING EXAMINER: All right, doctor. Now, viewing both exhibits 14 and 13, the only two reports submitted by Dr. Kirsch, an osteopath, do you find in it any x-rays, clinical or laboratory findings of any sort?

DR. PELTIER: No, I do not.

Q. I would call your attention to the fact that exhibit 13 says "on examination patient is extremely tender over lumbo sacral spine and sacro iliac on the left side." It is not clear from this whether this was elicited by palpation or merely history, is that correct? That's in exhibit 13.

A. I would think this would be on examination since the physician states that it is on examination rather than from the history.

Q. This might be a clinical finding?

A. Yes, sir. [Tr. 61].

But even a finding that the hearing examiner recognized as one that he would have to label as a "clinical finding" was effectively eliminated from further consideration by the following leading questions and answers:

Q. Now, I want you to correct me if I am wrong. I find no other clinical finding in either of these two reports, clinical or laboratory. There is no evidence as to what was performed or any other procedure including range of motion, leg stretching or anything else, is that correct? Now, the elicitation of pain on palpation, I presume this is what happened here. It depends upon the claimant's reaction, does it not?

A. That's right.

Q. In short, he tells you whether he hurts and how badly?

A. That's right.

Q. If there is facial expression accompanying it which would give evidence of this, it is not here apparent, is that correct?

A. That's correct.

Q. Dr. Peltier, then, so far as Dr. Kirsch's report is concerned, this is merely reporting history as given him by the claimant without independent medical determination of his own, I take it, so far as this report indicates?

A. That's correct. [Tr. 61–62].

The hearing examiner's examination of Dr. Peltier in regard to Dr. Williams' report of his examination in which that doctor found no objective evidence of "significant lower back pathology" [Tr. 116] was as follows:

Q. Dr. Williams, as a result of this examination states that he did not find any evidence of significant lower back pathology to explain this patient's subjective complaints. The tingling in the absence of pain in the lower extremity is not typical of lower back pathology with nerve root irritation. Would you agree with that conclusion, based on the reported findings?

A. Yes, I would.

Q. In short, that he has but minimal arthritic involvement with perhaps some pain due to muscle spasm?

A. That's correct.

\* \* \* \* \* \*

Q. There are a few things I want to ask you, Doctor. There are some medical authorities that I have reviewed that I am not entirely sure of and I want your medical opinion. In "Pain" by Dr. Cyril M. MacBryde, "Signs and Symptoms," edited by Dr. Cyril M. MacBryde, 3d edition, 1957 at page 54, he has said that "Continued pain has been demonstrated to have deleterious action upon vital organs, such as the heart and kidneys. Pain may initiate physical reactive patterns, usually recognizable as protective in nature, for example: elevation of arterial blood pressure, cardiac arrhythmias, cardiospasm, disturbances of gastric and colonic function, occlusion of nasal passages with or without lacrimation, etc. If such reactions are long-continued or frequently repeated, functional disorders may result and eventually tissue damage may result from the responses to pain."

Would you agree with this? This is talking about severe pain?

A. Yes, I would agree that this can occur.

Q. As long ago as Seneca's Epistles, he said "Remember that pain has this most excellent quality: If prolonged it cannot be severe and if severe it cannot be prolonged."

Would you agree with that?

A. I think so.

Q. There are two cases that have been handed down by the Missouri court which move over into the area of medicine, actually cite some medical authority that I would like your professional opinion of. In Cantrell vs. Ribicoff, 206 Federal Supplement 436 the court in a back injury case stated and I quote:

"Pain is a subjective symptom which cannot be measured qualitatively or quantitatively. However, continuous, severe, and intractable pain must, and does, leave its stigmata. In long-standing cases of severe and persistent back pain, there is usually present not only loss of motion in the back but such signs as impaired gait and weakness of the extremities with resultant muscular atrophy caused by the voluntary or involuntary restriction in the use of the back, weight loss, and progressive physical deterioration."

Would you agree with that conclusion of the court?

A. Yes, I think so. [Tr. 70–72].

The hearing examiner obtained Dr. Peltier's agreement with similar abstract statements concerning pain for several more pages of the transcript [Tr. 72–75]. We note in passing that the hearing examiner's reference to our quotation of the Appeals Council in *Cantrell* is out of context because we determined in that case that the record established that "much of plaintiff's testimony was not accepted by the Secretary" (206 F. Supp. 436). The rationale of the Secretary in *Cantrell* and in this case was entirely different. The Secretary refused to consider plaintiff's evidence in this case because he improperly determined that such evidence lacked probative value under Section 404.1510(a) of the Regulations.

The hearing examiner's examination of Dr. Gutknecht establishes that the hear-

ing examiner was not interested in any opinion expressed by that counseling psychologist for the Rehabilitation Institute that would take into account any interpretation of the medical evidence inconsistent with the limitations and restrictions imposed by Section 404.1510 (a) of the Regulations. The following questions and answers were asked Dr. Gutknecht:

Q. You understand that in this proceeding *you are to accept the assumed limitations which I will give you, based on the medical reports and the testimony of Dr. Peltier,* and these will be alternatives on the one hand and the claimant's complaint on the other. I may give you several hypotheses, and you will base your answer solely upon the hypotheses *accepting the limitations as I state them,* is that correct?

A. That's correct.

Q. You will not attempt to interpret the medical reports yourself or apply them?

A. No, sir. [Emphasis ours, Tr. 80].

The hearing examiner demonstrated by his examination of Dr. Gutknecht that he had already decided prior to the hearing to disregard all evidence except that supported by objective data appearing in the medical record. The fact that the hearing examiner had already determined that Dr. Kirsch's reports were based on what the hearing examiner believed to be inadequate data is made apparent by the following:

Q. Very good. Based on Dr. Kirsch's report, exhibits 14 and 13, as testified to by Dr. Peltier, *there is an inadequate basis for any of his diagnoses or statements of degree of severity.* He does state that the claimant can engage in no lifting or heavy work. If we make this assumption, given his third grade education, age at 56 and his work experience in general, farming, and rough carpentry, are there any occupations that you think this man can engage in if he couldn't lift at all or do any heavy work?

A. I believe I would say, no. [Tr. 80–81, emphasis ours.]

Total predecisional acceptance of Dr. Williams' report and Dr. Peltier's testimony is revealed by the following:

Q. All right. Based upon the assumptions which spring from Dr. Williams' report, exhibit 16, and the testimony of Dr. Peltier, that the only prohibitions are those against frequent and continuous bending and twisting and lifting of weights over 40 pounds with the notation that he can lift 40 pounds frequently, do you have an opinion as to whether there are occupations that this man can engage in in our economy?

A. Yes, I have.

Q. What would that opinion be?

A. I believe there are occupations, it's a matter of degree as to how much is implied by constant bending and stooping. There are jobs that would involve some what you might call normal physical activity. They don't involve heavy lifting. It would involve some squatting, some sitting, some standing, and some bending that are done in a rather routine manner. [Tr. 81].

Even though the plaintiff progressed only through the third grade and cannot now read or write, he could understand the direction the hearing was taking. When afforded an opportunity to ask Dr. Peltier a question, the following occurred:

CLAIMANT: * * * I would like to ask him, do you think I would be able to go back and work eight hours a day on carpentry work, lifting, bending, driving nails, such as that? Do you think I could do that?

DR. PELTIER: What I know about you, contained in the record, I think you would be able to go back to some type of work that did not involve a

great deal of bending and twisting and heavy lifting.

MRS. LEE: You don't say what kind that is.

HEARING EXAMINER: That is going to be his job (pointing to Mr. Gutknecht). The doctor is here to tell us what these findings mean and how they limit you in particular activities. I am going to ask Mr. Gutknecht, after he establishes that he is competent, to tell whether there is any kind of work with these limitations the doctor has given us that you could do, given your background.

MRS. LEE: I have a question. With his education, what sort of work do you think that—

HEARING EXAMINER: He couldn't be a clerk, that's obvious. You are asking questions that Mr. Gutknecht has to answer, not the doctor. He's not a vocational specialist, and you are asking him questions that he would have no right to answer even if he tried to answer them because he doesn't know. Is that correct, doctor?

A. That's correct. [Tr. 76–77].

When the claimant was given the chance to ask Mr. Gutknecht the same sort of question, the following occurred:

CLAIMANT: * * * I would like to ask where a person could go if I were going out here to do lawn service and I was working on a lawn, I would be working for a foreman, for somebody, my back would go to hurting me, I would have to go lay down, or go sit down for an hour or so. Do you think that he would qualify me for that job?

HEARING EXAMINER: This is another assumption. Let's assume that the claimant's testimony constitutes the medical fact that he can only stand or sit for an hour and then must lie down or do something else for an hour or so? Is there any position you think he could do under these circumstances?

A. An individual who can neither sit nor stand for any length of time, I know of no occupation they could perform. You have to be able to do one or the other. [Tr. 85].

But the hearing examiner's comment on Dr. Gutknecht's answer demonstrated that the hearing examiner had already determined in his own mind that plaintiff's evidence that he could not in fact hold down a job that might require bending or lifting forty pounds was to be disregarded. The hearing examiner attempted to explain to plaintiff why Dr. Gutknecht's testimony that he knew of no occupation plaintiff could perform would not be considered in support of plaintiff's claim. He stated the following:

HEARING EXAMINER: You see, he has to accept what I tell him about the limitations and I told him he was going to have one or more assumptions so if your only limitations are bending and lifting over forty pounds, this is what he was testifying to. Of course, if you can only sit or stand for an hour and then have to lie down or something, his testimony is that there really isn't anything you can do. [Tr. 86].

The hearing examiner's decision establishes beyond reasonable argument that he simply excluded from consideration the undisputed evidence adduced by the plaintiff concerning the extent and severity of his pain except to the extent objectively documented in accordance with the hearing examiner's construction and application of Section 404.1510(a) of the Regulations.

Insistence upon clinical and laboratory findings and the basis of the hearing examiner's rejection of evidence concerning the severity of plaintiff's impairment is apparent from the following portion of his decision:

Dr. Peltier commented with respect to Exhibits Nos. 13 and 14, the reports submitted by Dr. H. E. Kirsch, D.O., that the only specific finding in either report is that in Exhibit No. 13, which states that "On examination patient is extremely tender over lumbo sacral spine and Sacro iliac left side." *There*

*were no other clinical or laboratory findings,* and all the rest and remainder is merely a report of history as given to him by the claimant without any independent medical finding of his own. *In the opinion of Dr. Peltier that examination would not be sufficient to arrive at any conclusion as to the nature of claimant's impairment or its severity, for lack of sufficient findings.* [Emphasis ours, Tr. 10].

The hearing examiner indicated that had he considered plaintiff's evidence of impairment and pain, including but not limited to Dr. Kirsch's two reports of probative value, Mr. Gutknecht's testimony would have sustained plaintiff's disability claim. In that regard the hearing examiner stated:

An assumption based on Dr. Kirsch's reports (Exhibits 14 and 13), in turn based upon the conclusion expressed by Dr. Kirsch that claimant could engage in no lifting or heavy work, was presented to Mr. Gutknecht by the Hearing Examiner. If it was assumed that this was the medical fact, given claimant's third grade education, age 56, and his work experience in general farming and rough carpentry, Mr. Gutknecht testified that he did not believe that on these assumptions there were any occupations that claimant could engage in if he couldn't lift at all or do any heavy work. [Tr. 17].

But the hearing examiner made clear that he believed that he could only accept, for reasons presently to be noted, the opinions of Dr. Williams and Dr. Peltier because such opinions were the only opinions based on the objective symptoms as set forth in Dr. Williams' report. The hearing examiner's notion that such an assumption was the only permissible assumption permitted under Section 404.-1510(a) of the Regulations is made clear from the following portion of his decision:

In considering the foregoing evidence, both lay and medical, there are pertinent Regulations duly adopted by the Secretary of the Department which are for consideration. [Tr. 19–20].

The hearing examiner then quoted Sections 404.1502, 1510(a), and 1511 of the Regulations. Application of those regulations was made as follows:

Measured by the foregoing Regulations and by Dr. Peltier's professional testimony, it becomes clear that Dr. Kirsch's reports fail by a large margin to provide the necessary detailed findings to make his reports have significant probative value. As noted, he has largely reported only the claimant's complaints by way of history, and made but a single finding which, under both the Regulations and according to Dr. Peltier's testimony, is insufficient to support either a meaningful diagnosis or a determination of severity of any diagnosed condition.

It follows therefrom that the only evidence which, according both to Dr. Peltier and the foregoing Regulations, has any significant probative value is the report furnished by Dr. Williams, which reports detailed findings adequately supporting Dr. Williams' conclusions that claimant can engage in any kind of physical activity that does not involve continuous bending or twisting, and lifting of heavy weights, and as supplemented by Dr. Peltier, the latter means weights in excess of 40 pounds. He is able to stand or sit continuously despite his testimony to the contrary.

Additionally, the evidence of greatest probative value establishes that claimant has but minimal arthritic involvement and the Hearing Examiner believes that the whole of it, including Dr. Peltier's testimony and the medical authorities with which he agreed, establish that despite claimant's testimony to the contrary, his condition is not one from which it could be considered that there is any severe pain present. [Tr. 22].

The hearing examiner made clear that he believed that the only evidence of im-

pairment that had probative value was that presented by Dr. Williams' report as interpreted by Dr. Peltier. He stated in that connection the following:

> The Hearing Examiner believes that all of Dr. Peltier's testimony, the medical authorities and the specific findings in the only medical report *having any probative value,* that of Dr. Williams (Exhibit 16), all establish that there is not a sufficient pathological basis for claimant's subjective complaints of pain; that while he may have some pain as a result of the bilateral muscle spasm he does have, this too is on a minimal basis and involves restrictions as set forth by the competent medical evidence only prohibiting continuous bending and twisting and continuous lifting of weights over 40 pounds; but does not prevent walking, sitting, standing, or other physical activity; and on a continuous basis including periodic bending, so long as it is not continuous and does not involve repeated twisting. [Tr. 22–23].

It is important to note that the hearing examiner did not resolve any conflicts in the evidence. The most that can be said is that he accepted Dr. Peltier's testimony that plaintiff did not have "any severe pain * * * despite claimant's testimony to the contrary." Dr. Peltier did not examine plaintiff; his speculation that plaintiff did not suffer severe pain was based solely upon written reports which he was requested to evaluate in accordance with administrative standards established by Section 404.1510(a) of the Regulations promulgated by the Secretary.

The hearing examiner conceded in his formal findings of fact that plaintiff's "bilateral muscle spasm * * * may cause him *some* pain" and prevent him "from engaging in occupations requiring frequent and continuous bending and twisting or continuous lifting of weights over 40 pounds." But the hearing examiner rejected plaintiff's testimony and other evidence in regard to the severity of plaintiff's pain because the existence of such pain had not been properly documented in the medical data in a manner consistent with what the hearing examiner believed were the requirements of Section 404.1510(a) of the Regulations.

It is obvious that one does not and can not resolve a conflict in testimony when he takes the legal position that no conflict exists. The hearing examiner could not have resolved any conflict in the evidence adduced in this case because he held that the only evidence of probative value was that contained in Dr. Williams' report as explained by Dr. Peltier. All other evidence concerning the severity of plaintiff's pain and the consequent impairment that resulted directly therefrom stands almost undisputed. For reasons we shall now state, that evidence may not legally be ignored by an improper application of Section 404.1510(a) of the Regulations.

## II.

We note at the outset that defendant's brief in support of the Secretary's motion for summary judgment follows the pattern initially established by the hearing examiner before the hearing in this case was even conducted. Defendant bases his argument on Section 404.1510(a) of the Regulation promulgated by him. On page 8 of his supporting brief, he argues:

> Dr. Kirsch gave an opinion * * * apparently based upon plaintiff's subjective complaints of back pain. It is not supported by any reported objective medical findings.

Section 404.1510(a) of Regulations No. 4 of the Social Security Administration, 20 CFR 404.1510(a), states:

> "In order to establish that a medically determinable physical or mental impairment * * * is present there should be evidence that medically discernible anatomical, physiological, biochemical or psychological aberrations exist. Allegations of inability to work as a result of impairment such as dyspnea (shortness of breath), pain, lack of muscu-

loskeletal function, decreased vision or hearing, decreased memory, etc., should be shown to result from structural, physiological or psychological changes which can be identified by the use of clinical and laboratory diagnostic techniques. An alleged impairment is medically determinable only if it can be verified by the use of clinical and laboratory diagnostic techniques."

It is readily apparent that Dr. Kirsch's opinion does not comply with this regulation.

Having ruled Dr. Kirsch's opinion to be invalid because "it does not comply with this [Section 404.1510(a)] regulation," defendant attempts to suggest that a conflict existed between the reports of Dr. Kirsch and Dr. Williams. Defendant states on page 9 of his supporting brief:

Unlike Dr. Kirsch's evidence, the evidence of Dr. Williams constitutes objective medical findings based upon a variety of orthopedic tests and X-rays. Dr. Williams found no objective evidence to support plaintiff's subjective complaint of low back pain and tingling sensations. In his opinion, plaintiff should only avoid heavy lifting.

Dr. Peltier fully concurred with the conclusions of Dr. Williams.

Defendant then suggests that because "the Secretary as trier of fact is free to adopt the views of Drs. Williams and Peltier and to discount the opinion of Dr. Kirsch" a "conflict in the evidence" existed and, under the law, such assumed conflict is within the exclusive province of the Secretary to resolve. All that would be true if what defendant contends happened could be supported by the record.

But that is not what happened. What happened was that the hearing examiner determined that the opinions of Drs. Williams and Peltier were the only medical evidence that had any probative value and that he was free to ignore all the other

and largely undisputed evidence of plaintiff's impairment which was in fact fully corroborated by Dr. Kirsch's opinion. It is clear that the hearing examiner took this view because he believed that the Regulations under which he operated required that he refuse to consider such evidence as having any probative value.

For reasons this Court has stated in detail in the recent cases of *Pollard, Underwood* and *Homm,* we find and determine that the Secretary is without power to add restrictions to the standards enacted by the Congress. We further find and determine that the construction given Section 404.1510(a) of the Regulations by the hearing examiner, in this case had the effect of adding administrative restrictions to the federal statute and therefore cannot stand. In all three of the recent cases decided by this Court we followed and applied the teaching of Marion v. Gardner (8 Cir. 1966), 359 F.2d 175. We do the same in this case. Because the same Section 404.-1510(a) of the Regulations was involved in this case as was involved in *Marion* and in *Homm,* we adopt by this reference what we said in parts III and IV of our opinion in *Homm.* The factual situation in regard to remand is therefore comparable to that presented in *Pollard* and *Underwood.* We therefore follow *Pollard* and *Underwood* in directing that plaintiff's claim be allowed. The reasons stated by Chief Judge Becker in *Pollard* in regard to when a case need not be remanded for further hearing are adopted by this reference.

For the reasons stated, it is hereby

Ordered that the defendant's motion for summary judgment be, and the same is, hereby denied. It is further

Ordered that the decision of the defendant be, and the same is, hereby reversed. It is further

Ordered that this case be, and the same is, hereby remanded with the direction that plaintiff's claim be allowed.